IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| BILLY RANDALL THOMAS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 3:14-CV-56 (CAR) |
| DEPUTY BEN CORNELIUS, | : | |
| DETECTIVE BILL MCGEE, and | : | |
| DEPUTY CHARLES CLINE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Billy Randall Thomas brings excessive force claims pursuant to 42 U.S.C. § 1983 against Walton County Sheriff Deputies Ben Cornelius, Bill McGee, and Charles Cline. Plaintiff contends Defendants violated his Fourth and Fourteenth Amendment rights after Defendant Cornelius tasered him and then allegedly struck him in the face while he was handcuffed in the back of a police car. Plaintiff also brings Georgia state-law claims for assault and battery and intentional infliction of emotional distress. Currently before the Court is Defendants' Motion for Summary Judgment [Doc. 23]. After careful consideration, the Court finds Defendants are entitled to qualified immunity, and thus Defendants' Motion [Doc. 23] is **GRANTED**.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *See id.* at 249-52.

[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

pleadings and present specific evidence showing that there is a genuine issue of material fact.[6] This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

Plaintiff filed suit for excessive force in this case after Defendant Cornelius deployed his taser and, according to Plaintiff, struck Plaintiff in the face with an object while Plaintiff was handcuffed and lying in the backseat of a police vehicle. The record contains police dash-cam video evidence. The United States Supreme Court has recognized a "wrinkle" in cases where the record contains video evidence, holding that when facts are disputed, and video evidence is present, a court should "view[] the facts in the light depicted by the videotape."[8] Following the Supreme Court and viewing the facts in the light most favorable to Plaintiff, the evidence reveals the following:

Shortly before 5:30 PM on June 15, 2012, Plaintiff left his employment at the Home Depot and began driving home. At this time, Plaintiff suffered from severe right lateral epicondylitis and was scheduled for surgery the next week. Plaintiff's right arm was required to be in a sling, and he was taking prescription medication to help with his pain.

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[8] *Scott v. Harris*, 550 U.S. 372, 381 (2007).

Defendant Detective Bill McGee was also driving home at that time when he heard a Walton County 911 alert reporting a suspicious driver in a vehicle matching Plaintiff's truck, who appeared to be driving under the influence and travelling on the same road as McGee. McGee saw the truck approaching from the opposite direction.  As he prepared to turn around, the truck drifted into McGee's lane of travel, forcing McGee off the road to avoid a head-on collision. McGee immediately turned around and caught up with the truck, where he observed the truck stopped in the middle of the intersection. As McGee got out of his unmarked car to approach, the truck sped off, travelling on the wrong side of the road. McGee returned to his vehicle and pursued the truck using his emergency equipment. Around 5:30 PM, the truck came to a stop shortly after it almost hit a mailbox, and Detective McGee exited his vehicle to make contact with the driver.

Meanwhile, Defendant Deputy Ben Cornelius was responding to the area and heard over the radio that Detective McGee had made contact with the suspicious vehicle after it had nearly hit McGee's vehicle head-on. Detective McGee did not have a dash-cam in his vehicle because he was not assigned to the uniformed patrol division; Deputy Cornelius's patrol car, however, did have a dash-cam, and it recorded much of the underlying events.

4

When Deputy Cornelius arrived on the scene, he briefly spoke with Detective McGee who told him how the truck drifted over into his lane, and McGee almost "ditched" his own vehicle to avoid a collision.[9] After Deputy Cornelius radioed in the driver's license, he learned the driver was Plaintiff Billy Randall Thomas, who had a criminal history, which included possession of cocaine, open container, and DUI.[10] Plaintiff complied with Deputy Cornelius's request to get out of the truck and step to the rear of the vehicle and volunteered he was "on some medications," including Lortab.[11]

Plaintiff informed Deputy Cornelius he had last taken Lortab that morning; he had a prescription to take it every 3-4 hours for pain; and he had high blood pressure, high cholesterol, a herniated disk, a torn meniscus, torn ligaments and tendons in his elbow, and was having surgery the next week.[12] In response to Deputy Cornelius's inquiry about his erratic driving, failing to maintain his lane, and almost hitting Detective McGee's vehicle, Plaintiff explained he had been looking for his cell phone.[13] Because of Plaintiff's (1) perceived impairment, (2) erratic driving, (3) disclosure of having taken Lortab, (4)

---

[9] Cornelius dash-cam video at 2:19 [Doc. 23-6].
[10] *Id.* at 3:12-3:21.
[11] *Id.* at 3:56.
[12] *Id.* at 4:20.
[13] *Id.* at 5:46-6:00.

probationary status, and (5) prior convictions for DUI and possession of cocaine, Deputy

Cornelius requested Deputy Cline come to the scene to perform Field Sobriety Tests.[14]

Deputy Cline's patrol vehicle also had a dash-cam video that recorded much of

the incident. The built-in audio, however, was not operating correctly, so Cline used a

small digital dictaphone recorder in his shirt pocket to record audio. For the Court's

benefit, Deputy Cline's audio and video have been merged with no objection from any

party.

Upon his arrival on the scene, Deputy Cline briefly spoke with Deputy Cornelius,

who gave him a brief summary of what transpired before Cline's arrival, including the

fact Plaintiff had taken Lortab at 10:30 AM.[15] Deputy Cline asked Plaintiff if he would be

willing to submit to a standardized sobriety test, to which Plaintiff, in a congenial

manner, responded "sure."[16] Plaintiff, who wore a sling on his right arm, complied with

Cline's requests to step behind Deputy Cornelius's patrol car and submit to the sobriety

tests.[17]  Plaintiff responded to each of Deputy Cline's questions, informing Cline his

physical impairments included a detached retina, a torn meniscus, herniated disk

---

[14] Cornelius Investigation Narrative, p. 2, Doc. 23-2.
[15] Cornelius dash cam video at 21:10.
[16] Combined Cline dash cam video and digital recorder audio at 0:53-1:05, Doc. 23-9.
[17] *Id.* at 1:15-1:30.

surgery, and bone spurs.[18] Deputy Cline performed the sobriety tests for several minutes, and Plaintiff submitted to the tests without incident.[19]

After Deputy Cline finished the sobriety tests, he asked Plaintiff again to tell him about his physical disabilities. Plaintiff calmly responded he had a torn left meniscus and could not stand on that leg; he had bone spurs in his back; and he had torn ligaments and tendons in his elbow.[20] Deputy Cline then asked Plaintiff to wait while he spoke with the other officers. Again, Plaintiff complied without incident.[21]

Deputy Cline informed Deputy Cornelius Plaintiff could not complete any of the sobriety tests, and Detective McGee recapped for the officers his observations prior to the stop.[22] While the officers conversed, Plaintiff's wife, Vicky Thomas, drove up to the scene, exited her car, and said to her husband, "Honey, it's okay," to which Plaintiff responded, "Oh yeah, I'm okay."[23] The officers told her repeatedly to get back in her car, or they would arrest her.[24] Deputy Cornelius then walked over to Plaintiff, receiving clarification

---

[18] *Id.* at 1:30-1:53.
[19] *Id.* at 2:15-4:35.
[20] *Id.* at 4:40-5:00.
[21] *Id.* at 5:10.
[22] *Id.* at 5:46-6:30.
[23] *Id.* at 6:50.
[24] *Id.* at 6:50-7:13.

about the medications Plaintiff had taken.[25] Plaintiff also informed Cornelius he was scheduled for surgery on his arm the next week. After asking multiple questions about Plaintiff's arm injury and having Plaintiff take off his sling to display his range of motion, Cornelius advised Plaintiff he was under arrest.[26] Deputies Cornelius and Cline then handcuffed Plaintiff in the front of his body, and Deputy Cornelius read Plaintiff the implied consent notice.[27]

When Deputy Cornelius asked if he would submit to a blood test, Plaintiff stated he "c[ouldn't] afford it."[28] Deputy Cornelius asked him again if he would submit to the test, and again Plaintiff stated he "c[ouldn't] afford it," and he "[did]]n't have the money."[29] Plaintiff, seeming confused, then asked, "what is going on?", to which Cornelius again informed him he was under arrest for "DUI drugs."[30] Plaintiff responded he was "not DUI drugs."[31]

---

[25] *Id.* at 7:25.

[26] *Id.* at 8:37-9:26.

[27] *Id.* at 9:30-10:55.

[28] *Id.* at 10:56.

[29] *Id.* at 10:56-11:25.

[30] *Id.* at 11:29.

[31] *Id.* at 11:35.

As the officers searched his pockets, Plaintiff became distressed, stated he was on probation, and then called out his wife's name.[32] The officers told him to be quiet.[33] Plaintiff then pleaded with the officers, "why are y'all doing me this way? Can y'all not give me a warning? I don't have the money."[34] When Plaintiff yelled out to his wife, "they are going to take me to jail, Vicky," Deputy Cline told Plaintiff to "calm down, okay."[35] Plaintiff then, in a raised a voiced, called out, "This is a rip off."[36] Plaintiff asked to speak to his wife, and Deputy Cline told him no.[37] As Deputy Cline escorted Plaintiff to the patrol car, Plaintiff told Cline his wife needs to get his personal effects for him.[38]

As the officers put Plaintiff in the backseat of the patrol car, Plaintiff became agitated and yelled out, "I have prescriptions, officer, and I have to drive."[39] Deputy Cline for the second time told Plaintiff, "You need to calm down, okay."[40] Plaintiff then asked Deputy Cline to tell him "the legal limit while driving on Lortab."[41] Hearing this exchange, Deputy Cornelius walked over to the patrol vehicle and instructed Plaintiff to

---

[32] *Id.* at 11:45-12:00.
[33] *Id.* at 12:00.
[34] *Id.* at 12:33-12:45.
[35] *Id.* at 12:50-12:52.
[36] *Id.* at 12:53.
[37] *Id.* at 13:10.
[38] *Id.* at 13:20.
[39] *Id.* at 13:28-13:34.
[40] *Id.* 13:37.
[41] *Id.* at 13:42

"get out of the car."[42] Plaintiff did not get out of the patrol car and demanded to know the legal limit allowed to drive while taking Lortab.[43] Cornelius instructed Plaintiff for the second time to get out of the car.[44] Plaintiff complied, and told the officer he "had to take medication every four hours."[45]

Once Plaintiff stepped out of the vehicle, Deputy Cornelius removed the handcuffs from the front of his body and instructed him to put his hands behind his back.[46] Plaintiff complied and then yelled to his wife, "Vicky, come here!"[47] The officers, who were repositioning Plaintiff's handcuffs, told her to stay where she was and told Plaintiff if she came to him she would be arrested.[48] Plaintiff then yelled, "Vicky! They're taking me to jail."[49] After securing Plaintiff's hands behind his back, the officers walked him to the police car, and Deputy Cline instructed Plaintiff to "have a seat, bud."[50] Plaintiff did not comply.

---

[42] *Id.* at 13:42.

[43] *Id.* at 13:46.

[44] *Id.* at 13:52.

[45] *Id.*

[46] *Id.* at 14:00.

[47] *Id.* at 14:06.

[48] *Id.* at 14:08-14:11.

[49] *Id.* at 14:19.

[50] *Id.* at 14:40.

As Plaintiff stood in front of the open back door, he again yelled to his wife, "They are taking me to jail, regardless of prescriptions, regardless of anything."[51] For the second time Deputy Cline instructed Plaintiff to "have a seat, bud."[52] Again, Plaintiff did not comply. Instead, Plaintiff continued yelling, "This is a rip off. Rip off."[53] For the third time Deputy Cline directed Plaintiff to "have a seat, right now," and Deputy Cornelius also told Plaintiff to get in the car and sit down "right now."[54] Plaintiff did not follow their instructions. Instead, he told Deputy Cornelius he was not being respectful.[55] At that point, Deputy Cornelius put his hand on top of Plaintiff's head and told him he had "two seconds to sit in that car."[56] Plaintiff yelled out, "okay, okay, okay" as Deputy Cornelius and Deputy Cline, who had his hand on Plaintiff's shoulder, directed Plaintiff for the fifth time to "sit down" and forced Plaintiff into the patrol car.[57] As they forced Plaintiff into the car, Plaintiff again yelled "okay, okay" and told the officers he has had a broken neck.[58]

---

[51] *Id.* at 14:43.

[52] *Id.* at 14:48.

[53] *Id.* at 14:49.

[54] *Id.* at 14:49-14:54.

[55] *Id.* at 14:55.

[56] *Id.* at 14:58.

[57] *Id.* at 14:59.

[58] *Id.*

After being forced inside the vehicle, Plaintiff was handcuffed behind his back and seated in the backseat of the patrol vehicle, but he did not put feet inside the car; they remained outside on the pavement. As Plaintiff was telling the officers about his broken neck, Deputy Cline instructed Plaintiff to cooperate, and Cornelius informed Plaintiff he had "two seconds to get in there right now, or I am going to tase you."[59] This was the officers' sixth instruction to Plaintiff to get in the car and first warning of being tased. Plaintiff did not place his feet inside the vehicle. Deputy Cline reiterated to Plaintiff to get his feet into the car or he would be tased.[60] Still having not complied, Deputy Cornelius told Plaintiff again to "sit back in the car, right now," and Deputy Cline also told him to sit back.[61] When Plaintiff still had not complied, Deputy Cornelius warned Plaintiff for the second time, "If I have to tell you one more time, I'm going to tase you."[62] Plaintiff did not put his feet in the car and began to speak.

At that point, after ten instructions to comply with directives to get in the car—four of which specifically instructed Plaintiff to put his feet in the car—and three warnings he would be tased, Deputy Cornelius deployed his taser a single time, releasing

---

[59] *Id.* at 15:08.
[60] *Id.* at 15:11.
[61] *Id.* at 15:13.
[62] *Id.* at 15:15.

12

a five-second burst of electricity.[63] Deputy Cline immediately notified dispatch the taser had been deployed. Plaintiff admits his feet were not inside the vehicle at the time he was tased; he explains his physical impairments would not allow him to bring his feet inside the vehicle.

After tasing Plaintiff, Deputy Cornelius stood in front of the open back passenger door, leaned into the car and asked Plaintiff, "Are you going to listen to me," to which Plaintiff responded with a resounding "Yes!"[64] Cornelius then said, "I told you to do something; I need you to do it, okay? I ain't going to sit here fighting with you."[65] Plaintiff responded he was not fighting, and Cornelius told Plaintiff he had him fighting on camera; Plaintiff responded, "Bullshit."[66] Plaintiff contends after he said this profanity, Deputy Cornelius struck him in the face with some sort of object, causing severe bruising on both of his eyes and face, and contusions to the head.

Neither the video nor the audio evidence, however, shows Deputy Cornelius striking Plaintiff. Immediately after Plaintiff used the profanity, the dash-cam evidence shows Deputy Cornelius leaning into the car a little further. The viewer does not have a

---

[63] *Id.* at 15:18.
[64] *Id.* at 15:30.
[65] *Id.* at 15:33.
[66] *Id.* at 15:42.

clear view into the backseat of the patrol car because of the glare of the sun and the flashing lights off of the back window. As soon as Cornelius leaned into the car, Plaintiff almost simultaneoulsy told Cornelius he was on "hard times."[67] Plaintiff is heard explaining he had to pay $550 for his arm and telling the officers they had hurt his arm again.[68] The officers told Plaintiff if he had cooperated like they told him to, he would not have been tased.[69] Plaintiff responded, "Y'all are bad on your quota. That's all y'all are doing."[70] Thereafter, Deputy Cline shut the back door, and Plaintiff remained handcuffed in the backseat.[71]

## DISCUSSION

Following these events, Plaintiff filed suit in this Court under 42 U.S.C. § 1983, alleging Defendants violated his Fourth and Fourteenth Amendment rights to be free from excessive force.  Plaintiff also asserts state law claims for assault and battery and intentional infliction of emotional distress. Defendants now move for summary judgment contending qualified immunity shields them from § 1983 liability because the use of force was reasonable and did not violate clearly established law. Defendants also

---

[67] *Id.* at 15:46.
[68] *Id.* at 15:52.
[69] *Id.* at 16:00.
[70] *Id.* at 16:03.
[71] *Id.* at 16:14.

contend they are shielded by official immunity as to Plaintiff's state law claims.  As explained below, the Court agrees.

## I.  § 1983 Excessive Force Claims

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."[72] As the Supreme Court recently reiterated, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[73]  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."[74] Qualified immunity is immunity from suit and should be resolved as early as possible in the case.[75]

When an officer invokes qualified immunity, the initial burden is on the officer to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[76]  Once the officer satisfies that burden, the burden

---

[72] *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted).
[73] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).
[74] *Lee*, 284 F.3d at 1194.
[75] *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).
[76] *Lee*, 284 F.3d at 1194.

then shifts to the plaintiff to show that (1) a violation of a constitutional right occurred, and (2) that right was "clearly established" at the time of the violation.[77]

Here, it is clear all Defendants were acting within the scope of their discretionary authority. Therefore, the burden shifts to Plaintiff to prove the use of the taser and the strike to Plaintiff's face violated his clearly established Fourth and Fourteenth Amendment rights.

### A. Constitutional Violation

The Fourth Amendment's prohibition against unreasonable searches and seizures encompasses the right to be free from excessive force.[78] Accordingly, excessive force claims arising out of a stop or seizure are governed by the Fourth Amendment's objective reasonableness standard.[79] The reasonableness inquiry is objective—the issue is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation."[80] In making this determination, the Court must presume that the Plaintiff's version of the events is true,[81] but "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather

---

[77] *Pearson*, 555 U.S. at 232.

[78] *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).

[79] *Graham*, 490 U.S. at 395.

[80] *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) (quotation marks omitted).

[81] *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

16

than with the 20/20 vision of hindsight."[82] The Court should determine the "objective reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "governmental issue at stake."[83]

To aid in the reasonableness analysis, the Court "measure[s] the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight."[84] Though the Court should consider each of these factors, "[t]he Supreme Court has emphasized that there is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force."[85] "[I]n the end we must still slosh our way through the factbound morass of reasonableness."[86] As the Eleventh Circuit instructs:

> [W]e are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.[87]

---

[82] *Mercado*, 407 F.3d at 1157.

[83] *Graham*, 490 U.S. at 396; *Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11th Cir. 2005).

[84] *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).

[85] *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 382 (2007)).

[86] *Scott*, 550 U.S. at 383 (quotation marks omitted).

[87] *Crosby*, 394 F.3d at 1333-34.

### 1.  Use of the Taser

Plaintiff first claims Deputy Cornelius used excessive force when he deployed the taser while Plaintiff was handcuffed in the backseat of the patrol vehicle. The Court disagrees: Based on the facts and circumstances confronting him at the time, Deputy Cornelius's use of the taser to effectuate Plaintiff's arrest was "reasonably proportionate to the difficult, tense, and uncertain situation" the officers faced and did not constitute excessive force.[88]

First, Plaintiff was stopped for suspicion of driving under the influence of drugs or alcohol. "Generally, more force is appropriate for a more serious offense and less force is appropriate for a less serious one."[89] Although DUI is a misdemeanor and not a violent crime, it certainly is a serious crime. Indeed, Plaintiff's driving had created a serious hazard on the roadway: He had been driving erratically, even on the wrong side of the road, and had forced Detective McGee's vehicle off of the road. Moreover, Plaintiff admitted he had taken Lortab, a controlled substance that impairs one's ability to drive. Thus, Plaintiff demonstrated to be a serious hazard to both himself and the public.

Second, the officers reasonably believed Plaintiff posed a threat to their safety. The officers instructed him four times to sit down in the back seat of the patrol car

---

[88] *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).
[89] *Vinyard*, 311 F.3d at 1347 (citations omitted).

before putting their hands on him to force him into the vehicle because he would not comply with their instructions. The officers then instructed him four more times to put his feet inside the vehicle and warned Plaintiff three times if he did not comply with their instructions, he would be tased. Plaintiff failed to comply with each of their commands and never put his feet inside the vehicle. Although Plaintiff was handcuffed and seated in the patrol car, his legs were unrestrained, his feet were unsecured and remained on the ground outside of the car, and he continuously ignored the officers' instructions and commands. It was certainly reasonable for the officers to believe he posed an immediate threat to their safety, as he could have easily fought the officers with his legs and feet.

Finally, Plaintiff unquestionably failed to follow the instructions of the officers. "Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car[.]"[90] The Eleventh Circuit has equated the use of pepper spray and the use of a taser gun as comparable uses of force.[91] Moreover, the Eleventh Circuit has acknowledged that the use of a taser may well prevent physical harm to both the

---

[90] *Vinyard,* 311 F.3d at 1348.
[91] *See Draper*, 369 F.3d at 1278.

suspect and the officer.[92] Indeed, there is no evidence the taser caused any injury to Plaintiff.

Plaintiff argues he was not refusing to comply with the officers' instructions; instead he was simply trying to explain that his physical impairments prevented him from placing his feet inside the vehicle while his hands were handcuffed behind his back. Plaintiff's argument, however, misses the mark. This Court must look at the situation from the perspective of a reasonable officer. Knowing Plaintiff had taken a controlled substance, almost forced a fellow officer off of the road, and repeatedly refused to follow police instructions, a reasonable officer could believe Plaintiff might act erratically, unpredictably, and even violently by kicking and injuring the officers. Even "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, [ ] the officer would be justified in using more force than in fact was needed."[93]

Under the totality of the circumstances in this case, Deputy Cornelius's use of the taser "was reasonably proportionate to the difficult, tense, and uncertain situation that [the officer] faced at this traffic stop, and did not constitute excessive force."[94]

---

[92] *Id.* ("The single use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or [the defendant officer].").

[93] *Saucier*, 533 U.S. at 205.

[94] *Draper*, 369 F.3d at 1278.

**Strike to Plaintiff's Face**

Plaintiff also asserts Deputy Cornelius used excessive force when he allegedly struck Plaintiff in the face. Plaintiff contends a genuine issue of material fact exists as to whether Deputy Cornelius in fact struck him in the face while Plaintiff was handcuffed in the backseat of the patrol car. Defendant contends no genuine issue of material fact exists because Deputy Cline's dash-cam video establishes no strike ever took place. Plaintiff points to Deputy Cline's dash-cam video from 15:19 until 16:14, arguing it is virtually impossible to determine what is happening to Plaintiff inside the vehicle during this time because of the glare caused by the patrol car's flashing lights and the sun's reflection. The Court, however, disagrees. Based on the video and audio evidence, no reasonable juror could find Deputy Cornelius struck Plaintiff during this time.

"It is true that we construe the facts in the light most favorable to the non-moving party. But when 'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it,' a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment. This is so because when the non-movant's assertion is 'so utterly

discredited' by the record, no 'genuine' dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant."[95]

That is the case here. Given the video and audio evidence, Plaintiff's testimony cannot create a genuine issue of material as to whether Defendant Cornelius struck him. Upon watching the video, it is wholly unbelievable Defendant Cornelius struck Plaintiff. Throughout this entire time, the video shows Deputy Cornelius leaning into the car through the open back passenger door with his right arm outside the vehicle on top of the open door frame and, for most of the time, his left arm resting on the roof of the car. There is a total of nine seconds that the viewer cannot see Deputy Cornelius's left arm: for one second, from 15:44 until 15:45, and for eight seconds, from 15:49 until 15:57. These nine seconds are the only conceivable times Cornelius could have struck Plaintiff. Deputy Cornelius's body, however, makes no motion indicating he swung at or struck Plaintiff. On the contrary, his body indicates he made no such motion, as he remains leaned over through the car door.

More importantly, there is absolutely no audio indication Plaintiff was struck. In fact, the audio confirms Plaintiff was not struck. Deputy Cornelius and Plaintiff can be heard having a conversation the entire time about how Plaintiff is "on hard times." Plaintiff does not yell, grunt, call out, or make any other indication he was struck. It is

---

[95] *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (quoting *Scott*, 550 U.S. at 380).

simply wholly unbelievable Plaintiff would make no audible indication after allegedly being struck across the face with an object that caused severe bruising to his eyes and face, and contusions to his head. The Court finds the video and audio conclusively establish Deputy Cornelius did not strike Plaintiff, and thus, Defendants are entitled to summary judgment on this claim.

**Clearly-Established Law**

Even if Deputy Cornelius's use of the taser did violate Plaintiff's constitutional rights, qualified immunity still protects Defendants because any such rights were not clearly established. "For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates the law."[96] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[97]  In other words, the issue is whether the law gave the officer "fair warning" that his conduct was unconstitutional.[98]  When determining whether the law is clearly established, factually similar cases are "usually . . . needed to demonstrate that officials were fairly warned

---

[96] *Bates v. Harvery*, 518 F.3d 133 (11th Cir. 2008).
[97] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[98] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

that their application of force violated the victim's constitutional rights."[99]   In conducting the clearly-established analysis, "the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law."[100]  To find such cases, the Court must look only "to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of [Georgia]."[101]

Despite Plaintiff's contentions otherwise, no case law gave Defendants fair warning their actions would violate Plaintiff's constitutional rights. On the one hand, Eleventh Circuit cases considering whether the use of a taser is constitutionally excessive "establish that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates the suspect's rights under the Fourth Amendment."[102] For example, in *Fils v. City of Aventura*, the Eleventh Circuit found clearly established excessive force when the defendant officer responded to a bystander's profanity by deploying his taser three times.[103] Similarly, in *Vinyard v.*

---

[99] *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).

[100] *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015).

[101] *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013).

[102] *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011).

[103] *Id.* at 1277.

*Wilson*,[104] the court found the defendant officer's use of pepper spray on a handcuffed and secured suspect while she was seated in the back to a police car to be excessive.

On the other hand, police are permitted to use tasers in order to secure a suspect whom they reasonably perceive as threatening or disobeying their commands. In *Zivojinovich v. Barner*,[105] the Eleventh Circuit found the defendant officer's strike to the plaintiff's face causing a broken nose and use of a taser reasonably proportionate to the need for force in light of Plaintiff's resistance to arrest. In *Draper v. Reynolds*,[106] the Eleventh Circuit found a one-time taser shock that did not inflict any serious injury was reasonably proportionate to the need for force during a traffic stop because the suspect was "hostile, belligerent, and uncooperative," and refused to comply with the officer's verbal commands.[107]

Here, as in *Draper* and *Zivojinovich*, Plaintiff refused to comply with the arresting officers' commands and instructions. Although Plaintiff was handcuffed and seated in the back seat of the patrol vehicle, seemingly making this case more like *Vinyard*, he was not fully secured, was uncooperative, and was noncompliant, thus establishing this case's material differences from *Vinyard*. Plaintiff's feet remained outside of the car posing a threat to the officers' safety. By contrast, the *Vinyard* court specified that "[a]t

---

[104] 311 F.3d 1340 (11th Cir. 2002).

[105] 525 F.3d 1059, 1073 (11th Cir. 2008).

[106] 369 F.3d at 1278.

[107] *Id.*

all times Vinyard remained in the back seat and handcuffed behind her back <u>with her feet on the floorboard</u>," posing no threat to the officers, herself, or the public. [108] Moreover, unlike the plaintiff in *Vinyard*, Plaintiff was uncooperative and noncompliant and only tased a single time. The facts here are more like *Draper* than *Vinyard*.

Existing law at the time of this incident did not put Deputy Cornelius on notice that deployment of the taser violated Plaintiff's constitutional rights where the taser was used to subdue a noncompliant suspect, whose hands were handcuffed, but whose feet and legs were not fully secured, thus posing a threat to the officers' safety. Moreover, Deputy Cornelius's one-time use of the taser under these circumstances does not rise to the level of "obvious clarity," which would require all reasonable officers to inevitably conclude the force was excessive.[109] Thus, even if the use of the taser constituted excessive force, Defendants are still entitled to qualified immunity because their actions did not violate Plaintiff's clearly established rights.

**B.  State Law Claims**

    **a.  Official Immunity**

---

[108] *Vinyard*, 311 F.3d at 1343-44 (emphasis added).
[109] *See Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012).

In addition to the § 1983 claims, Plaintiff brings state law assault and battery and intentional infliction of emotional distress claims against Defendants.  Defendants move for summary judgment arguing official immunity bars these claims.  The Court agrees.

Under Georgia law, an officer is entitled to official immunity for injuries caused by his actions unless he negligently performed "ministerial functions" or performed "official functions" "with actual malice or with actual intent to cause injury."[110]  Georgia courts define "official functions" as "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts."[111]

Here, as mentioned above, Defendants were performing a discretionary function when they decided to stop and arrest Plaintiff.[112]  Therefore, to overcome official immunity, Plaintiff must provide sufficient evidence to suggest Defendants acted with "actual malice or with actual intent to cause injury." "The bar for proving malice or an intent to cause injury is high."[113]

> [A]ctual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff[]. Likewise, the phrase "actual intent to

---

[110] *Gilbert v. Richardson*, 264 Ga. 744, 753 (1994) (quoting Ga. Const. art. I, § II, ¶ IX(d)).

[111] *Gilbert*, 264 Ga. at 753.

[112] *See also Kidd v. Coates*, 271 Ga. 33, 33 (1999); *Tittle v. Corso*, 256 Ga. App. 859, 861-62 (2002).

[113] *Schwartz v. Gwinnett Cnty., Ga.*, 924 F. Supp. 2d 1362, 1378 (N.D. Ga. 2013).

cause injury" has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive.[114]

Construing the facts in the light most favorable to Plaintiff, there is no evidence showing any Defendant acted with malice or intent to cause injury.  On the contrary, the evidence shows Defendants reasonably believed Plaintiff posed a threat to their safety by refusing to place his legs inside the patrol car, and the use of the taser was necessary to get Plaintiff to comply with their commands without engaging in a physical struggle that could cause physical injuries to Plaintiff and the officers. Accordingly, Defendants are entitled to official immunity, and summary judgment is granted as to Plaintiff's state-law assault and battery and intentional infliction of emotional distress claims.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [Doc. 23] is **GRANTED**.

**SO ORDERED,** this 28th day of March, 2016.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

---

[114] *Marshall v. Browning*, 310 Ga. App. 64, 67-68 (2011).